FILED
United States Court of Appeals
Tenth Circuit

May 9, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

SHERI M. MOUNTS,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

Defendant-Appellee.

No. 11-1172
(D.C. No. 1:10-CV-00732-CMA)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

---

Sheri M. Mounts appeals from a judgment of the district court affirming the

Commissioner's denial of her application for Social Security disability benefits and

supplemental security income benefits. Exercising jurisdiction under 28 U.S.C.

§ 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.

Mounts filed an application for benefits in January 2008, in which she claimed disability beginning December 17, 2007, due to a back disorder, depression, and anxiety. Mounts was 38 years old when she applied for benefits. She has a high school diploma and a two-year degree in dental hygiene, and worked for many years as a dental hygienist before she filed her application. Her claim was administratively denied and she requested a hearing. An administrative law judge (ALJ) conducted a hearing in November 2009, and in January 2010, the ALJ issued a decision in which he concluded that Mounts was not disabled. The Appeals Council denied review, and Mounts appealed to the district court, which affirmed the Commissioner's denial of benefits. This appeal followed.

Mounts does not dispute the ALJ's finding that her back problems limit her to sedentary work, with additional restrictions on bending, squatting, kneeling, and climbing. Her arguments focus solely on her mental impairments. In particular, Mounts raises two issues: (1) whether the ALJ followed the law in weighing the opinions from a licensed clinical social worker, an examining psychologist, and a non-examining psychiatrist; and (2) whether substantial evidence supports the ALJ's assessment of her residual functional capacity (RFC) as it pertains to her mental impairments.

## II.

Mounts was hospitalized for more than two weeks beginning in late January 2008. The discharge summary states that she "has a past medical history of depression [and] chronic low back pain," Admin. R. Vol. II at 272, and notes that "[s]he was a chronic alcoholic," *id*. She was diagnosed with and treated for "alcohol-related pancreatitis," *id*., and back pain. A couple of weeks after her release from the hospital, Mounts went to the hospital again, this time with complaints of dizziness. The assessment sheet noted a past history of pancreatitis, back pain, depression, and anxiety. Mounts was discharged that same day.

On April 10, 2008, Richard B. Madsen, Ph.D., a consultative psychologist, met with Mounts for "an adult Comprehensive Psychiatric Consultation, Diagnostic Interview Evaluation and detailed Mental Status Exam." *Id*. at 393. He noted that "she was the informant for the exam and appeared to be reliable." *Id*. Mounts told Dr. Madsen that she "does not want to go anywhere, does not shower, does not clean her house, and has difficulty getting out of bed." *Id*. She reported panic attacks, wanting to be alone, and a fear of going to the store by herself. She also told Dr. Madsen that she was sexually abused by an uncle from the age of nine until she was sixteen. Regarding the mental status exam, Dr. Madsen wrote that Mounts "is oriented to person, place and time. . . . Affect is consistent with a depressed, cheerful mood. Thought process is non-psychotic. Content is logical and relevant. Motor behavior and speech were slow. No evidence of any suicidal, homicidal ideation."

*Id.* at 394. Dr. Madsen concluded: "Her ability to do work-related activities is impaired. She will have difficulty maintaining a regular work schedule, focusing and concentrating on work, relating to peers, coworkers, supervisors and the general public." *Id.* at 395.

A state agency psychiatrist, Donald G. Glasco, M.D., reviewed Mounts's medical records and prepared a "Mental Residual Functional Capacity Assessment," *id.* at 404, on April 16, 2008. He noted moderate limitations in two categories: (1) her ability to understand and remember detailed instructions; and (2) her ability to carry out detailed instructions. In the remaining eighteen categories, he found Mounts not significantly limited. In his summary, Dr. Glasco wrote: "With abstinence from alcohol, [Mounts is] capable of work that can be learned in up to 3 months time." *Id.* at 406.

Throughout 2008, Mounts received treatment for her physical ailments, including alcohol dependency, from the Pueblo Community Health Center. On April 24, 2008, a physician assistant wrote: "I am really concerned about her." *Id.* at 467. "She seemed majorly depressed." *Id.* That same day, Mounts had her first session with Cynthia Jimenez, a licensed clinical social worker. In her "Initial Brief Assessment," *id.* at 468, Ms. Jimenez wrote: "[Mounts] was upset because she has just received a denial letter from SS disability." *Id.* Mounts told her that "she can't recall ever not feeling depressed," *id.*, and that she "has had prob[lems] holding a job due to . . . severe back pain [and] poor attendance," *id.*

Ms. Jimenez next saw Mounts nearly two months later on June 17, 2008. Mounts reported chronic pain and criticism from her stepfather and mother. Ms. Jimenez "[a]ssigned homework of revising resume [and] working on household tasks in brief sessions." *Id*. at 462. Ms. Jimenez wrote that Mounts was "tearful [and] appears frustrated throughout session. She seems overwhelmed by tasks she needs to complete [related to] DUI [and] work issues." *Id*.

More than six months passed until Ms. Jimenez next saw Mounts on January 14, 2009. At this meeting, Mounts "revealed sig[nificant] childhood abuse (sexual) and current abuse." *Id*. at 449. At their next meeting on January 28, Mounts reported "feel[ing] a little better [and] more energized[.]" *Id*. at 444. She denied any suicidal or homicidal ideation, although Ms. Jimenez noted that she was angry at family members and "struggl[ing] to hold on to any hope that she has." *Id*.

On March 14, 2009, Mounts told Ms. Jimenez that "she is feeling very badly about herself. She is very frustrated with the weight gain that seems to have come on very suddenly. She reports that she is not drinking at all, and she has been working." *Id*. at 442. Mounts also reported that "[s]he has had a good talk with the temp service person to explain why she feels she can be reliable and working and should be called." *Id*. She told Ms. Jimenez that she was embarrassed about driving an "old farm truck," *id*., and wants a new car, and that "typically if she is not working, she does not get dressed and go and do anything," *id*. Ms. Jimenez observed that although Mounts's "mood continues to be depressed," it was "slight[ly] improved."

- 5 -

*Id.* "She is struggling to hold onto hope but seems to be much more encouraged, and she is working. She finds a pretty much promise of work throughout the summer, so long as she is able to have good attendance at the job." *Id.* Regarding her alcohol dependency, Ms. Jimenez noted that Mounts "is being avoidant about facing going in [to alcohol classes] because each time she attends a class, she is hit anew with what could have happened, and this is pretty devastating to her." *Id.* at 443. Ms. Jimenez noted the need to reschedule appointments to accommodate not only her schedule, but Mounts's work schedule as well.

When Ms. Jimenez saw Mounts on March 25, 2009, she reported that "she continues to be feeling very raggedly [sic] about herself." *Id.* at 440. Mounts told Ms. Jimenez that she left her alcohol class early because the topic was social life and "she feels that she has no social life, so it was a very touchy subject for her." *Id.* "She reports that she is still working and is glad about that. However, [she] is very ashamed of her appearance due to a weight gain and very ashamed about the vehicle she is driving." *Id.* Mounts also told Ms. Jimenez that she feels better when she is working or watching television, otherwise "her mind is continually jumping from one thought to another[.]" *Id.*

Ms. Jimenez next saw Mounts on June 24, 2009, "after multiple cancellations[.]" *Id.* at 437. Mounts reported that "she has been working quite a lot at a temporary job and being called in by her temporary agency. She admits that she is still occasionally drinking but not to excess. She has gone on a date." *Id.* She

also reported buying a new vehicle, "which her mother did not really want her to do." *Id.* Ms. Jimenez observed that Mounts "looks alert. Her eyes are clear. She has just come from having a facial procedure and seems to be looking very well." *Id.* She added that "[i]n general, [Mounts's] mood seems to have somewhat stabilized and improved. . . . We continue to try to kind of struggle to put a treatment plan together, but due to the very sporadic nature of her appointments, this has been quite difficult[.]" *Id.*

Just a few days later, Mounts returned for a session with Ms. Jimenez. Her primary complaint was increased physical pain, which Mounts herself believed was "related to the stress she has been feeling related to her mother's recent announcement that she is leaving her live-in-boyfriend of 20 years." *Id.* at 435. She was upset that the boyfriend was refusing to give her mother "startup money." *Id.* Ms. Jimenez and Mounts "processed this issue throughout the session." *Id.* Ms. Jimenez opined that Mounts was "trying to protect and over control with her mother's situation." *Id.* Despite the anxiety over the breakup, Ms. Jimenez wrote that Mounts, "in general, is being pretty proactive. She is working and beginning to take more control over her own life." *Id.* at 435-36.

Ms. Jimenez next saw Mounts on July 13, 2009. Mounts reported losing her job and having "a serious car accident [that] totaled her car." *Id.* at 430. Ms. Jimenez wrote: "She really seems to be in crisis mode more than anything else and is having a very difficult time focusing on a set treatment plan and breaking that

crisis cycle." *Id.* On August 3, 2009, the last date of the records from Ms. Jimenez, she observed that Mounts "was actually much calmer[.]" *Id.* at 429. Mounts reported "a lot of anxiety mainly due to finances and difficulty finding a steady job. She has been working quite a lot at various offices through the temporary agency she is with. She has a strong lead on a more reliable job, not full time but at least working a couple of days a week routinely." *Id.*

On November 5, 2009, Ms. Jimenez completed a "Residual Functional Capacity Evaluation (Mental)," *id.* at 505, in which she diagnosed Mounts with major depression, alcohol withdrawal, and post-traumatic stress disorder. She wrote that Mounts is "[s]everely depressed . . . daily, no motivation – routine tasks are overwhelming to her. She tends to isolate at home in darkened room, cries daily. [Complains of] poor sleep, nightmares that wake her. 2 past suicide attempts – now daily thoughts of suicide." *Id.* Ms. Jimenez opined that Mounts had extreme limitations in five areas of functioning and marked limitations in ten areas. As to how long these limitations had been present, Ms. Jimenez wrote: "Severe throughout adulthood – suspect since a child based on client's report of abuse." *Id.* at 507.

At the hearing, the ALJ asked the vocational expert (VE) two hypothetical questions. The first question asked the VE to assume an individual the same age educational background as Mounts who was limited to "no complex tasks defined as SVP three or less, GEDs one through three, and only occasional dealing with the general public." *Id.* Vol. I at 43. The VE testified that there were a number of jobs

that Mounts could perform. The second hypothetical contained the limitations noted by Ms. Jimenez. The VE testified that an individual with those limitations could not perform competitive work.

### III.

In a thirteen-page decision, the ALJ discussed *all* of the above evidence, and more. The ALJ found that the medical records from 2008 "do not support the severity of impairment alleged by [Mounts]." *Id*. at 20. As to the records from 2009, the ALJ likewise found, as a general matter, that they "do not support the severity of the [alleged] impairment[.]" *Id*. at 21. Instead, he found that "[t]hey do show that [Mounts] was able to work and was, in fact, frequently working through a temp agency." *Id*.

The ALJ gave no weight to Dr. Madsen's assessment because "it is not supported by any objective test results, is not supported by longitudinal treatment, and is not support[ed] by the evidence of record as a whole." *Id*. Likewise, the ALJ gave no weight to Ms. Jimenez's assessment, because "it is by a non-medical source and it is not compatible with the other evidence of record." *Id*. Regarding Dr. Glasco, the ALJ "accepts this assessment as consistent with and supported by the evidence of record and gives it some limited weight." *Id*.

As to Mounts's testimony, the ALJ found: "After careful consideration of **all** the evidence . . . [her] . . . statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are not

supported by the evidence of record." *Id*. at 22. Specifically, the ALJ found that although Mounts testified that she had not worked since 2006, "the records clearly show [she has] been working part-time since at least April 2008." *Id*. Further, the ALJ found that Mounts's allegation that "she could not work or attend AA because she could not be around people," *id*., was untrue, because "the medical records . . . show[] [that Mounts] does work and told [Ms. Jimenez] that she could not go to AA because it showed her what she could become with continued alcohol use," *id*. And although Mounts claimed that she had lost consciousness, the ALJ noted that she never reported these incidents to any health care provider. Last, he discounted her testimony that she was having trouble with her antidepressant medication because the records showed that it was helping her.

After noting the applicable regulations for weighing the medical evidence, the ALJ found that Mounts retained the functional capacity to perform sedentary work (with occasional bending, squatting, kneeling, and climbing) that did not involve complex tasks and required only occasional dealings with the public. Based on the testimony of the VE that Mounts could work as an appointment clerk, escort vehicle driver, or dispatcher, the ALJ concluded that she was not disabled.

**IV.**

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)

(quotation omitted). In other words, "[w]e consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id*. (quotation omitted). "We review only the *sufficiency* of the evidence, not its weight[.]" *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,] [and] requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084 (quotation omitted).

## A. Cynthia Jimenez

A licensed clinical social worker, such as Ms. Jimenez, is not an acceptable medical source as defined in 20 C.F.R. § 404.1513(a). Instead, she is classified as an "other source" whose evidence can be considered to show the severity of a claimant's impairment and how it affects her ability to work. Soc. Sec. Ruling 06-03p, 2006 WL 2329939 at *2 (Aug. 9, 2006). Opinion evidence from "other sources" is evaluated using the following factors: (1) the length of time the source has known the claimant and how frequently the source has seen the claimant; (2) the consistency of her opinion with other evidence; (3) whether there is relevant evidence to support the opinion; (4) how well the opinion is explained; (5) the source's qualifications; and (6) any other factors that tend to support or detract from the opinion. *Id*. at *4-*5.

Mounts argues that the ALJ did not follow the law in weighing Ms. Jimenez's opinion.[1] We disagree. As a preliminary matter, the ALJ relied on § 404.1513(d), in evaluating Ms. Jimenez's opinion when he wrote: "Opinion evidence may also include evidence from other medical and non-medical sources that show the severity of the claimant's impairments and how they affect the claimant's ability to work." Admin. R. Vol. 1 at 22. He also cited SSR 06-03p, including the relevant factors that apply to weighing opinions from "other sources." *Id*. As to what factors apply, SSR 06-03p states: "Not every factor for weighing opinion evidence will apply in every case. . . . Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions *and a weighing of all the evidence in that particular case*." *Id*. at *5 (emphasis added).

Next, Mounts asserts that the ALJ's finding is "too general to be valid and must fail," Aplt. Opening Br. at 14, and finds further fault with the ALJ for failing to "specify which particular evidence is not compatible with Ms. Jimenez's opinion,"

---

[1] We agree with the district court that the ALJ mistakenly referred to Ms. Jimenez as a "non-medical source" rather than a "non-acceptable medical source." Regardless, the misnomer does not matter, because opinions from "other sources," which include "non-medical sources" and "non-acceptable medical sources" alike, are evaluated using the same factors. *See* SSR 06-03p, 2006 WL 2329939 at *4; *see also Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). Moreover, because Ms. Jimenez was not an "acceptable medical source," she was not a "treating source," whose opinion was entitled to special deference. *Id*. at 1301 ("Only 'acceptable medical sources' . . . can be considered treating sources[.]").

*id.* This argument does not take into account the difference between what an ALJ must consider as opposed to what he must explain in the decision.

> [T]he case record should reflect the consideration of opinions from [other sources]. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability . . . decision, the adjudicator generally should explain the weight given to the opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p at *6.

Thus, we have held that it is not necessary for the ALJ to address each factor expressly or at length. *See Oldham,* 509 F.3d at 1258 ("not every factor for weighing opinion evidence will apply in every case") (alteration and quotation omitted). As long as the ALJ provides "good reasons in his decision for the weight he gave to the . . . opinion[], [n]othing more [is] required[.]" *Id.* (citation omitted). What matters is that the decision is "sufficiently specific to make clear to any subsequent reviewer[] the weight the adjudicator gave to the . . . opinion and the reasons for that weight." *Id.* (quotation omitted). The ALJ's decision meets this test.

There is also no merit to Mounts's argument that the ALJ rejected or discounted Ms. Jimenez's opinion simply because she is not a physician. To the contrary, the ALJ described in detail Ms. Jimenez's notes, and after acknowledging the applicable regulations and ruling, the ALJ gave Ms. Jimenez's opinion no weight *because it was inconsistent with the record.*

Last, Mounts argues that Ms. Jimenez's opinion is not inconsistent with the record because it is "generally compatible with Dr. Madsen's opinion[.]" Aplt. Opening Br. at 14. Setting aside the fact that Dr. Madsen's opinion is just one piece of evidence, this is not an alleged failure to follow the law. What Mounts is asking this court to do is reweigh the evidence and find that the ALJ's finding is not supported by substantial evidence. But we cannot reweigh the evidence. *See Lax*, 489 F.3d at 1084. And the ALJ's finding is supported by substantial evidence, which is defined as "more than a scintilla, but less than a preponderance." *Id*.

**B. Richard B. Madsen**

Dr. Madsen opined that Mounts's "ability to do work-related activities is impaired." Admin. R. Vol. II at 395. "She will have difficulty maintaining a regular work schedule, focusing and concentrating on work, relating to peers, coworkers, supervisors and the general public." *Id*. The ALJ found that his opinion was not entitled to any weight because "it is not supported by any objective test results, is not supported by longitudinal treatment, and is not support[ed] by the evidence of record as a whole." *Id*. Vol. I at 21.

In his decision, the ALJ wrote that he considered the factors in 20 C.F.R. § 404.1527(d) in deciding what weight to afford Dr. Madsen's opinion. These factors include the length and nature of the relationship and the consistency of the opinion with the record as a whole. As we stated previously, it is not necessary for the ALJ to address each factor expressly or at length. As long as the ALJ provides "good

reasons in his decision for the weight he gave to the . . . opinion[], [n]othing more [is] required[.]" *Oldham*, 509 F.3d at 1258 (citation omitted).

Mounts further argues that it was wrong to reject Dr. Madsen's opinion because it was not supported by objective testing. After all, Mounts argues, Dr. Glasco's opinion was not supported by any testing either. Setting aside the fact that Dr. Glasco was a reviewing source, we need not decide whether the lack of testing matters, because the other two reasons given by the ALJ are more than adequate for this court to discern why the ALJ rejected Dr. Madsen's opinion.

For example, Dr. Madsen's opinion is not supported by Ms. Jimenez's longitudinal treatment notes; instead, Ms. Jimenez's notes reflect that Mounts was working (albeit part time), and never reported any significant difficulties focusing and concentrating on her work, or getting along with co-workers. It is for these same reasons that Dr. Madsen's opinion is inconsistent with the record as a whole.

### C. Donald G. Glasco

Dr. Glasco is the state agency psychiatrist who conducted a review of Mounts's records and opined that with abstinence from alcohol, Mounts was capable of performing work that could be learned in three months. The ALJ gave "some limited weight," Admin. R. Vol. I at 21, to Dr. Glasco's opinion, because it was "consistent with and supported by the evidence of record," *id*.

As a general proposition, Mounts is correct that an ALJ should apply a more rigorous test for weighing opinions from non-examining physicians such as

Dr. Glasco. But the same standard applies to Dr. Madsen's opinion as well. "[T]he opinions of physicians or psychologists *who do not have a treatment relationship with the individual* are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2 (July 2, 1996) (emphasis added). Because neither Dr. Madsen nor Dr. Glasco had a treatment relationship with Mounts, there is no merit to the argument that more weight should have been afforded to Dr. Madsen's opinion.

Mounts further argues that the ALJ was required to weigh Ms. Jimenez's opinion against Dr. Glasco's opinion and also state the reasons why Dr. Glasco's opinion was entitled to greater weight than the opinions of Ms. Jimenez and Dr. Madsen. We acknowledge that there is a regime for weighing other medical evidence against a treating physician's opinion. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[W]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around."). But there is no treating physician in this case and thus no requirement for the ALJ to have weighed the opinions in any particular order or against each other.

Next, Mounts asserts that the ALJ failed to adequately explain why he gave Dr. Glasco's opinion "some limited weight." This argument does not take into account the difference between what an ALJ must consider as opposed to what he

must explain in the decision. The ALJ is not required to address each factor expressly or at length. *See Oldham*, 509 F.3d at 1258; *see also* SSR 06-03p at *6. As long as the ALJ provides "good reasons in his decision for the weight he gave to the . . . opinion[], [n]othing more [is] required[.]" *Oldham*, 509 F.3d at 1258 (citation omitted). What matters is that the decision is "sufficiently specific to make clear to any subsequent reviewer[] the weight the adjudicator gave to the . . . opinion and the reasons for that weight." *Id.* (quotation omitted). Again, the ALJ's decision meets this test.

Last, Mounts argues that Dr. Glasco's opinion is not consistent with the evidence, because it conflicts with Ms. Jimenez's and Dr. Madsen's opinions. She also adds that Dr. Glasco's opinion conflicts with Mounts's testimony. First, the ALJ found that Mounts's testimony regarding the severity of her symptoms was not entirely credible. More to the point, Mounts is asking this court to reweigh the evidence, which we cannot do. *See Lax*, 489 F.3d at 1084.

## D. The RFC Assessment

The ALJ found that Mounts has the mental RFC to perform work that does not involve "complex tasks (SVP-3 or less) (G.E.D. 1-3); and only occasional dealing with the public." Admin. R. Vol. I at 16 (bolding omitted). Mounts argues that there was no evidence to support the ALJ's finding that she could perform work at the

general educational development (GED) level three.[2] We disagree. Job descriptions in the Dictionary of Occupational Titles contain several elements required to perform a specific job, including a claimant's GED, which is the level of formal and informal education required to perform a specific job. There is no genuine dispute that Mounts retained the GED to perform the jobs as an appointment clerk, escort vehicle driver, or dispatcher, as testified to by the VE.

The judgment of the district court is AFFIRMED.


Entered for the Court


Timothy M. Tymkovich
Circuit Judge

---

[2] Mounts complains there was no evidence to support the ALJ's limitation that she only have occasional dealing with the general public. Because this additional limitation works to her benefit, we decline to address the argument.